IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| COLIN BOYLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| CITY OF CHICAGO and CHICAGO | ) |
| POLICE OFFICER KERRY POZULP, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

NOW COMES the Plaintiff, COLIN BOYLE, by and through his counsel, LOEVY & LOEVY, complaining of the Defendants CITY OF CHICAGO and CHICAGO POLICE OFFICER KERRY POZULP, to hold Defendants accountable for CHICAGO POLICE OFFICER KERRY POZULP's unjustified use of force against Plaintiff, a credentialed journalist, while he reported at a recent protest of the Columbus statue located at the southeast corner of Columbus Drive and Roosevelt Road, as partially documented on video taken by Plaintiff during Defendants' assault. In support, Plaintiff BOYLE alleges as follows:

### INTRODUCTION

1. Like many cities around the country, especially those with histories of police misconduct, protests erupted in Chicago in the wake of the murder of George Floyd in Minneapolis.

2. As explained in detail below, Plaintiff BOYLE, a credentialed member of the press, was assaulted by CHICAGO POLICE OFFICER KERRY POZULP at a protest while Plaintiff posed no threat to anyone.

**PARTIES**

3. Plaintiff COLIN BOYLE is an Illinois resident who lives in the City of Chicago. Plaintiff is a freelance journalist and photographer for *Block Club Chicago*. At all times relevant to this Complaint, Plaintiff was working on assignment as a contract journalist and displaying his Chicago Police Department-issued press credentials.

4. Defendant CHICAGO POLICE OFFICER KERRY POZULP ("OFFICER POZULP") is currently a Chicago Police officer who committed the acts set forth below as an agent of Defendant CITY OF CHICAGO. OFFICER POZULP engaged in the conduct complained of in the course and scope of employment and under color of law.

5. Defendant CITY OF CHICAGO ("City" or "City of Chicago") is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the employer and principal of Defendant OFFICER POZULP.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

7. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located in this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

**FACTUAL ALLEGATIONS**

8. On July 17, 2020 Plaintiff was present at a protest in front of the Christopher Columbus statue on the corner of Columbus and Roosevelt. Plaintiff was present to observe, document, and report as a journalist.

9. At all times relevant in this Complaint, Plaintiff wore and held a press badge issued by Chicago Police Department ("CPD") and a red helmet with a sign attached that said "PRESS"

on the front and back. Plaintiff repeatedly announced his press status in the presence of CPD officers, including OFFICER POZULP, to ensure they knew he was a member of the press.

10. During all of the events described herein, Plaintiff stood at an appropriate distance from the CPD officers, including OFFICE POZULP, posed no threat to the officers, and did not interfere with, or attempt to interfere with, the officers' actions.

11. At all times relevant in this Complaint, Plaintiff complied with the orders or directives given by CPD, including promptly answering CPD Officers when asked about his journalistic affiliation and moving away from the immediate area when asked to do so.

12. At approximately 8:32 P.M., Plaintiff started crossing Columbus Drive and headed westbound to reach his bicycle to depart the protest with his CPD-issued press badge displayed.

13. As Plaintiff was crossing Columbus, OFFICER POZULP was also crossing the street and heading eastbound, when he addressed Plaintiff. Plaintiff heard the word "fuck," but could not make out the entirety of OFFICER POZULP's comment.

14. Plaintiff asked OFFICER POZULP to repeat what he said and asked if there was an issue.

15. In response to Plaintiff's question, OFFICER POZULP approached Plaintiff and shouted, "Do you want a problem?"

16. Plaintiff stated that he was a member of the press, did not want any problem, and explained that he was trying to leave the protest safely.

17. OFFICER POZULP then dared Plaintiff, "Why don't you film me? Huh, film me!" or words to that effect.

18. Plaintiff repeated that he did not want any problem and was on his way to retrieve his bike to leave the protest.

19. Plaintiff tried to continue westbound, but OFFICER POZULP followed Plaintiff, grabbed Plaintiff from behind, dragged, and shoved him to the east sidewalk.

20. Once they reached the sidewalk, Plaintiff was able to access his phone and started to film the interaction.

21. After letting go of Plaintiff, OFFICER POZULP quickly advanced toward Plaintiff while shouting, "You are being a smart ass! Walk around! Why don't you try to walk around?"

22. OFFICER POZULP was less than a foot away from Plaintiff during this interaction and was not wearing a mask, and continued to advance toward Plaintiff as Plaintiff moved backwards away from OFFICER POZULP.

23. Plaintiff's encounter with OFFICER POZULP occurred in the midst of the COVID-19 pandemic. At that time and continuing to today, CPD officers were required to wear masks in any area where maintaining six feet of social distancing is not possible, including when interacting with members of the public.

24. As of the date of this Complaint, there have been hundreds of confirmed cases of COVID-19 within CPD.

25. At a June 1, 2020 press conference, Mayor Lightfoot stated, "If officers are not wearing the mask and protective gear that we provided, then they have to be disciplined."

26. Upon information and belief, one or more CPD supervisors observed OFFICER POZULP not wearing a mask when one was required but did not discipline OFFICER POZULP.

27. As OFFICER POZULP attacked and shouted at Plaintiff, Plaintiff asked for help from other CPD Officers who were near him, but no one intervened to stop OFFICE POZULP or help Plaintiff.

28. Upon hearing Plaintiff's plea for help, OFFICER POZULP stated "Yeah, you're gonna need help!"

29. Plaintiff once again asked fellow CPD officers who were near them to help him, but no one responded.

30. In fear for his safety, Plaintiff said "I am going, I am going!" At that point, OFFICER POZULP no longer followed Plaintiff and let him go.

31. As a result of this fear for his safety, Plaintiff did not attempt to gather any additional news.

32. OFFICER POZULP knew that Plaintiff was a journalist when he used force against Plaintiff.

33. At the time OFFICER POZULP used force against Plaintiff, Plaintiff posed no threat to anyone.

34. Since starting his career at CPD in October 2005, Defendant OFFICER POZULP filed a total of twenty-nine Use of Force Reports between 2006 and 2015, which is more than 98% of other officers.

35. There have been at least twenty-two allegations of misconduct filed against Defendant OFFICER POZULP, seven of which pertain to Defendant OFFICER POZULP's use of force both on and off duty. Two complaints were sustained, including "conduct unbecoming"; some complaints were resolved as "unfounded"; some were closed for lack of affidavit; and several were resolved as "not sustained" because police officers denied the allegations and there was no evidence beyond the statement of the complainant or complainant witnesses that IPRA deemed "biased." Upon information and belief, the "not sustained" resolutions did not investigate or

consider the possibility that the officers involved were engaged in the code of silence or that fellow officers were biased witnesses.

36. The following passages are taken from various Complaint Register files involving OFFICER POZULP:

> The Reporting Investigator recommends that a finding of Not Sustained for Allegations #1-3 against Officer Kerry Pozulp in that he pushed the victim, [Redaction] [Redaction] struck [Redaction] on the right jaw area, and stated to [Redaction], "Shut the fuck up punk, you are in my world now." Department Reports document that officers were given permission to enter [Redaction] residence by [Redaction] However, attempts to contact and interview [Redaction] were unsuccessful. [Redaction] stated that he suffered soreness to his jaw, but he did not receive medical treatment documenting his injury. There is no evidence to corroborate or refute the allegations and attempts to interview [Redaction] were also unsuccessful. The witness officers denied observing Officer Pozulp commit the allegations and Officer Pozulp denied the allegations made against him. There is insufficient evidence to prove/disprove the allegations.

> Accused: Officer Kerry Pozulp #17342
>
> The investigator recommends that Allegations #1 thru 4 be Not Sustained. There were no eye-witnesses to corroborate claims made by victim [Redaction] At this time, there is insufficient evidence to prove or disprove the allegations made against Officer Pozulp.

> Based on the facts that the complaining party did not introduce additional evidence or unbiased witnesses to collaborate her account of the incident combined with the denials of the accused, the undersigned cannot prove or disprove allegations 1 and 2. However, allegation 3 will be SUSTAINED in that the accused did not provide their names and star numbers upon request, admitting in their TO/FROM reports that they told the complainant they would provide the information in the 002nd District.

> The R/I was unable to locate any additional witnesses or cameras that captured the alleged incident. Officer Pozulp denied committing the acts alleged against him. Additionally, there is insufficient evidence to either support or refute the allegations. Based on the available evidence, the R/I recommends that the allegations against Officer Pozulp be Not Sustained.

> This investigation has shown that [Redaction] has been unable to substantiate any credible evidence that would suggest that Officer Pozulp was involved in the illegal sale and distribution of anabolic steroids. Attempts to set up a proffer with the main target of the steroid distribution case have been unsuccessful. Absence any verifiable evidence by [Redaction], the undersigned is unable to prove or disapprove the allegation and recommending that this case be closed with a finding of not-sustained.

37. OFFICER POZULP was named as a defendant in at least three police misconduct lawsuits that cost the City a total of $815,000 in settlements. Two of those suits involved Defendant OFFICER POZULP's use of excessive force.

### Violence by the Chicago Police During Peaceful Protests

38. Plaintiff's experience at the protest was not an anomaly. The Chicago Police Department has historically responded—and continues to respond—to protests with unconstitutional tactics.

39. On June 23, 2020, the Chicago Reader published an in-depth examination of the CPD's use of lethal force during the May 2020 protests. The reporter documented "83 baton strikes on at least 32 different people by officers, most captured on video. Nearly all appear to violate [CPD] policy with more than half of the strikes on video involving police beating people who were already on the ground. Multiple videos also show officers hitting protesters in the head with batons despite rules limiting these strikes to situations requiring deadly force." The Reader article notes that these unlawful uses of force often occurred in full view of supervisors who failed to intervene and that most officers failed to report their uses of force.

40. CPD's response to the protests against police violence has also included police officers tackling protesters to the ground, kneeing protesters in the neck and back, kicking protesters in the legs to cause them to fall, trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces, using tear gas and pepper spray,

dragging protesters through the streets, punching protesters in the face, stomping on protesters on the ground, and beating protesters severely.

41. CPD officers have pushed, shoved, battered, and harassed people who were filming acts of police brutality during the protests. Often this resulted in confiscated or damaged cameras and physical injury to protesters exercising their First Amendment right to record the police.

### CPD's Use of Force Policy

42. Chicago police officers have a de facto policy and widespread custom of using unnecessarily or excessive force against civilians.

43. City of Chicago officials have long been aware of the City's failure to properly discipline its police officers.

44. In 1999, following two high profile police shootings, the City Council held public hearings on the prevalence of police brutality and unjustified shootings, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues. CPD's Superintendent at the time acknowledged that CPD needed a more effective disciplinary system.

45. On January 13, 2017, nearly two decades later, the Department of Justice ("DOJ") Civil Rights Division released a report detailing their findings of their investigation of the Chicago Police Department. The DOJ concluded the following:

> i. Deficiencies in CPD's training, supervision, accountability, and other systems had contributed to a pattern and practice of excessive use of force;
>
> ii. The CPD failed to review its force practices as a whole to identify problematic trends and patterns that endangered the officers and the community; and

      iii.    The CPD failed to provide its officers with adequate guidance to understand how and when they may use force or how to safely and effectively control and resolve encounters to reduce the need to use force.

46.    As a result of Chicago's inadequate training and supervision, officers on the streets are ill-equipped to make the necessary decisions on the use of force. The lack of training and supervision greatly increases the susceptibility of officers to improper and violent abuses of their police power through the unjustified use of force, such as the verbal and physical assault in this case.

47.    Defendant OFFICER POZULP had been on the force for over fifteen years and was still unable to detain himself from using unwarranted and excessive force toward a journalist practicing his constitutional right.

48.    The City and CPD's failure to provide Defendant OFFICER POZULP the necessary supervision in addition to holding him accountable for his past allegations regarding use of excessive force, before sending him on the streets to control massive crowds at a protest led to the unjustified assault of Plaintiff.

49.    By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of unnecessary force against civilians, defendant City of Chicago has manifested and manifests deliberate indifference to the deprivation of Mr. Boyle's constitutional rights.

50.    These polices, practices and customs collectively, directly and proximately caused the violations of Plaintiff's constitutional rights set forth above, such that the City of Chicago is liable for its officers' use of excessive force.

**Policy and Practice of Impunity**

51. At all times relevant to Plaintiff's claims, the City of Chicago and CPD routinely failed to investigate cases in which Chicago Police Officers used excessive force and/or seized an individual without justification. Prior to and during the period in which Plaintiff suffered excessive force and improper seizure, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

52. In the DOJ's 2017 report on CPD (mentioned in the previous section), regarding the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

53. The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of

egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

54. Similarly, the Chicago Police Accountability Task Force ("PATF") reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

55. Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

56. Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated.

57. More than 95% of complaints against the Chicago Police are found to be un-sustained as of 2016.

58. Less than 2% of complaints against the Chicago Police resulted in any discipline as of 2016.

59. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

60. The failure of police supervision and discipline in the City of Chicago throughout history is a fact admitted by City policymakers and Chicago Police officers.

61. Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within the Chicago Police Department.

62. In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

63. In 2017, the DOJ found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

64. Mayor Lori Lightfoot urged federal prosecutors to examine the trial of Chicago Police officers accused of covering up the Laquan McDonald shooting, saying "[w]e've got to have transparency and healing."

65. Most recently, in January 2020, the interim Superintendent of CPD, Charlie Beck also acknowledged that "code of silence" exists in CPD.

66. The code of silence in the Chicago Police Department has been longstanding.

67. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct.

68. In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

69. The same code of silence and ineffective system of police oversight were in place when Plaintiff's constitutional rights were violated on July 17, 2020.

70. As a result of the City's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant OFFICER POZULP here) have come to believe that they may violate the civil rights of members of the public.

71. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This includes Defendant OFFICER POZULP in this case.

**COUNT I: EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983**

72. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

73. As described in the preceding paragraphs, the conduct of the Defendant OFFICER POZULP toward Plaintiff constituted excessive force in violation of the United States Constitution.

74. The use of force described in this Count was objectively unreasonable and undertaken with willfulness and/or reckless indifference to the rights of others.

**COUNT II: SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983**

75. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

76. OFFICER POZULP used physical force and a display of authority to restrain Plaintiff's movement.

77. OFFICER POZULP had no legal justification to restrain Plaintiff's movement.

**COUNT III: FIRST AMENDMENT INTERFERENCE WITH FREE PRESS, 42 U.S.C. § 1983**

78. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

79. Plaintiff is a member of the press.

80. OFFICER POZULP's use of force restricted Plaintiff's ability to gather the news, including, for example, with regard to OFFICER POZULP's actions, including his use of profanity when addressing Plaintiff, in violation of the First Amendment.

## COUNT IV: FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983

81. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

82. At the time of the attack, Defendant OFFICER POZULP was aware that Plaintiff engaged in First Amendment-protected activities as a journalist.

83. Upon information and belief, Defendant OFFICER POZULP attacked Plaintiff in retaliation for his First-Amendment-protected activity. Defendant OFFICER POZULP's actions would chill a person of ordinary firmness from continuing to engaged in protected activity.

84. In the manner described more fully above, Defendant OFFICER POZULP's actions were substantially motivated as a response to Plaintiff's constitutionally protected activity. Defendant OFFICER POZULP would not have attacked Plaintiff but for his protected activity.

## COUNT IV: INDEMNIFICATION

85. Each paragraph of this Complaint is incorporated as if restated fully herein.

86. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

87. Defendant OFFICER POZULP was an employee of the CITY OF CHICAGO, acting at all relevant times within the scope of his employment in committing the acts described herein.

## COUNT V: NEGLIGENT SUPERVISION AGAINST DEFENDANT CITY OF CHICAGO

88. Each paragraph of this Complaint is incorporated as if restated fully herein.

89. Defendant CITY OF CHICAGO and its police department at all times had a duty to exercise due care in supervising its police officers, including OFFICER POZULP.

90. Defendant CITY OF CHICAGO and its police department breached those duties by failing to exercise due care in supervising officers who were involved, often repeatedly

involved, in the use of excessive force and other instances of misconduct investigated by the Department.

91. As a direct and proximate result of the CITY OF CHICAGO's failing to exercise due care in supervising its officers, OFFICER POZULP committed the acts alleged in this Complaint.

### COUNT VI: WILLFUL AND WANTON SUPERVISION AGAINST DEFENDANT CITY OF CHICAGO

92. Each paragraph of this Complaint is incorporated as if restated fully herein.

93. The Defendant CITY OF CHICAGO and its police department at all times had a duty to refrain from willful and wanton supervision of its police officers.

94. The Defendant CITY OF CHICAGO and its police department breached that duty by engaging in willful and wanton conduct in supervising OFFICER POZULP and other officers present at the scene.

95. As a direct and proximate result of the CITY OF CHICAGO's willful and wanton failure to supervise, OFFICER POZULP committed the acts alleged in this Complaint.

### COUNT VII - ASSAULT

96. Each paragraph of this Complaint is incorporated as if restated fully herein.

97. OFFICER POZULP engaged in intentional acts intending to cause a harmful or offensive contact with Plaintiff.

98. As a result, Plaintiff was put in imminent apprehension of such contact.

### COUNT VIII - BATTERY

99. Each paragraph of this Complaint is incorporated as if restated fully herein.

100. OFFICER POZULP committed multiple intentional, unprivileged, and harmful and offensive contacts of Plaintiff without his consent. This includes grabbing, pushing, use of a baton,

and exposing Plaintiff to OFFICER POZULP's unmasked, close-range breathing and shouting during a pandemic involving a disease known to transmit through exactly the activities in which OFFICER POZULP engaged.

**WHEREFORE**, Plaintiff asks that the Court:

i. Declare that Defendants' conduct violated First and Fourth Amendments of the U.S. Constitution;

ii. Award Plaintiff damages compensating him for his injuries;

iii. Award punitive damages against Defendant OFFICER POZULP;

iv. Enjoin future interference with the press through the use of unjustified force;

v. Award attorneys' fees and costs; and

vi. Award such other and further relief the Court deems equitable and just.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable.

Dated: September 3, 2020

RESPECTFULLY SUBMITTED,
/s/ *Matthew Topic*

Attorneys for Plaintiff,
COLIN BOYLE

Matthew Topic
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
matt@loevy.com